CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Zachary M. Crosner (SBN 272295)
zach@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JESSICA VU, individually, and on behalf of all others similarly situated, | Case No.  8:24-cv-02265 |
| | CLASS ACTION COMPLAINT |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| PATAFOODS, INC. d/b/a Amara Organic Foods, Inc. | |
| Defendant. | |

Plaintiff Jessica Vu ("Plaintiff") brings this action against Defendant PataFoods, Inc., doing Business as Amara Organic Foods, ("Defendant"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to Plaintiff's acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys as follows:

## SUMMARY OF DEFENDANT'S CONTAMINATED UNHEALTHY PRODUCTS

1.     Defendant sells food products aimed at young children called Amara Organic Smoothie Melts (the "Products"). The Products are available in a variety of flavors, each with the same representations made on the Product packaging.[1] The problem is the Products contain lead, cadmium, and arsenic and are not healthy as Defendant contends.

2.     There are no "safe" levels of lead. The World Health Organization ("WHO") states: "There is no level of exposure to lead that is known to be without harmful effects." [2]

3.     The U.S. Centers for Disease Control and Prevention ("CDC") states: "There are no safe levels of lead in the blood." [3]

4.     The U.S. Food & Drug Administration ("FDA") states "there is no known safe level of exposure to lead …"[4]

---

[1] There are five flavors of the Product: (1) Mango Carrot, (2) Mixed Red Berry, (3) Mighty Sweet Green, (4) Carrot Raspberry, and (5) Beets n' Berries.

[2] World Health Organization, *Lead Poisoning* (Aug. 11, 2023), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (emphasis orignial)

[3] .S. Centers for Disease Control and Prevention, *About Childhood Lead Poisoning Prevention* (May 23, 2024) *available at* https://www.cdc.gov/lead-prevention/about/index.html

[4] .S. Food & Drug Administration, Lead in Food and Foodwares (July 25, 2024) *available at* https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares

5.      Lead affects numerous organs and systems in the body and accumulates over time. This leads to health risks and toxicity, including hindering neurological function, anemia, and kidney damage. [5]

6.      No reasonable consumer would buy the Products if they knew the Products contained toxic and harmful ingredients such as lead, cadmium, and arsenic.

7.      Further, the Products' packaging gives consumers the net impression that the Products are healthy and do not contain toxic heavy metals. The packaging displays large, realistic, and brightly colored images of fresh fruit and includes statements such as: "highest quality"; "You're already the best parent—now you have the snacks to prove it."; and 'We believe parents' shouldn't have to choose between nutrition and convenience. You—and your child—deserve both." Heavy metals are not "nutritious," "high quality," and children do not "deserve" them as Defendant claims.

8.      Heavy metal testing performed on the Mighty Sweet Greens Flavor of Amara Organic Smoothie Melts has been recently published. The test results revealed that the Products tested positive for more than **35.1 ppb of lead**, **101 ppb of cadmium**, and **28.4 ppb of arsenic**.[6] A second round of testing found the Carrot Raspberry flavor of Amara Organic Smoothie Melts contained **11 ppb of arsenic**, **31 ppb of cadmium**, and **20 ppb of lead**.[7] These test results are applicable to all

---

[5] Wani AL, et al., *Lead toxicity: a review*, INTERDISCIP TOXICOL. (June 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898

[6] https://tamararubin.com/2024/08/amara-organic-smoothie-melts-in-mighty-sweet-greens-flavor-tests-positive-for-unsafe-levels-of-lead-cadmium-and-arsenic-lab-report-here/

[7] https://tamararubin.com/2024/10/amara-organic-smoothie-melts-in-carrot-raspberry-flavor-test-positive-for-unsafe-levels-of-lead-cadmium-arsenic-september-2024-lab-report/

CLASS ACTION COMPLAINT

the Products as they contain the same or similar ingredients that are sourced from the same areas and the Products are packaged in the same facility.

9.     The Products contain heavy metals at levels several times greater than what the U.S. Food and Drug Administration ("FDA") recommends:

| | FDA Guidance Action Level | Amara Carrot Raspberry For Children Percent of Action Level | Amara Mighty Greens For Children Percent of Action Level |
|---|---|---|---|
| Lead | 5 ppb | 400% 20 ppb | 702% 35.1 ppb |
| Cadmium | 5 ppb | 620% 31 ppb | 2,020% 101 ppb |
| Arsenic | 10 ppb | 110% 11 ppb | 284% 28.4 ppb |

10.     To make matters worse, the Products provide essentially no nutritional value for children. The Products have very minimal amounts of vitamins and minerals in ranges of 0% to 4% of the Daily Value percentage:

**Mixed Red Berries**

**Mighty Greens**

## Nutrition Facts

4 Servings per container
**Serving size**                    1/4 cup (7g)

| Amount per serving **Calories** | Age 1-3 years **35** | Age 4+ years **35** |
|---|---|---|

| | | % DV | | % DV |
|---|---|---|---|---|
| **Total Fat** | 2g | 5% | 2g | 3% |
| Saturated Fat | 1g | 7% | 1g | 7% |
| Trans Fat | 0g | 0% | 0g | 0% |
| **Cholesterol** | 0g | 0% | 0g | 0% |
| **Sodium** | 2mg | 0% | 2mg | 0% |
| **Total Carb.** | 7g | 2% | 7g | 2% |
| Dietary Fiber | <1g | 4% | <1g | 2% |
| Total Sugars | <1g | | <1g | 1% |
| Incl. Added Sugars | 0g | 0% | 0g | 0% |
| **Protein** | <1g | 3% | <1g | 1% |
| | | | | |
| Vitamin D | 0g | 0% | 0g | 0% |
| Calcium | 3mg | 2% | 3mg | 2% |
| Iron | 0g | 2% | 0g | 2% |
| Potassium | 70mg | 4% | 70mg | 2% |

## Nutrition Facts

4 Servings per container
**Serving size**                    1/4 cup (7g)

| Amount per serving **Calories** | Age 1-3 years **33** | Age 4+ years **33** |
|---|---|---|

| | | % DV | | % DV |
|---|---|---|---|---|
| **Total Fat** | 2g | 5% | 2g | 3% |
| Saturated Fat | 1g | 7% | 1g | 7% |
| Trans Fat | 0g | 0% | 0g | 0% |
| **Cholesterol** | 0g | 0% | 0g | 0% |
| **Sodium** | 6mg | 0% | 6mg | 0% |
| **Total Carb.** | 3g | 2% | 3g | 2% |
| Dietary Fiber | <1g | 4% | <1g | 2% |
| Total Sugars | <1g | | <1g | 1% |
| Incl. Added Sugars | 0g | 0% | 0g | 0% |
| **Protein** | <1g | 4% | <1g | 1% |
| | | | | |
| Vitamin D | 0g | 0% | 0g | 0% |
| Calcium | 8mg | 2% | 8mg | 2% |
| Iron | 0g | 4% | 0g | 2% |
| Potassium | 74mg | 4% | 74mg | 2% |

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Mango Carrots**



**Carrot Raspberry**



**Beets n' Berries**



11.    The Products also contain "coconut milk" which is not healthy for children. The Healthy Eating Research recently issued science-based guidelines for young children which have a "Not recommended" rating for coconut milk

4

because coconut milk does not promote "healthy growth and development" for young children.[8]  The negative recommendation is "based on scientific research and w[as] reached through consensus by the following organizations: Academy of Nutrition and Dietetics, American Academy of Pediatric Dentists, American Academy of Pediatrics, American Heart Association."[9]

12.    Accordingly, Plaintiff brings this action seeking redress for Defendant's false advertising and deceptive conduct on behalf of all consumers in the United States.

### JURISDICTION AND VENUE

13.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate, exclusive of interest and costs.

14.    This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the formulation, ingredients, manufacturing, labeling, marketing, and sale of the Products in California, specifically in this district. The Products' package states the Products are "Distributed by PataFoods, Inc. San Franscico, CA 94117."  The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing,

---

[8] https://healthydrinkshealthykids.org/app/uploads/2023/05/New-HDHK-Summary-Table_May-2023.pdf

[9] https://healthydrinkshealthykids.org/

CLASS ACTION COMPLAINT

and sale of the Products to consumers in California, including Plaintiff. The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it reasonable for Defendant to defend this lawsuit because it has sold harmful Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally expressly aimed conduct at California which caused harm to Plaintiff and the Class which Defendant knows is likely to be suffered by Californians.

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant engages in continuous and systematic business activities within the State of California. Venue is further proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District because Plaintiff purchased one of the Products within this District.  Venue is also proper in this District pursuant to Cal. Civ Code. § 1780(c) because Defendant is doing business in this District, and Plaintiff purchased a Product at issue in this District.

## PARTIES

16.    Defendant PataFoods, Inc. is a Delaware corporation that maintains its a place of business in San Francisco, CA.  The Products' package states the Products are "Distributed by PataFoods, Inc. San Franscico, CA 94117." Defendant maintains a registered agent in California at 1325 J Street, Sacramento, CA. Throughout the Class Period, Defendant was the manufacturer and distributor of the Products.

17.    Plaintiff Jessica Vu is a resident of Orange County, California. Plaintiff purchased the Products during the class period. Plaintiff relied on Defendant's deceptive labeling claims and material omissions as set forth below.

CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS

### THE LABELS AND ADVERTISING OF THE PRODUCTS LEAD REASONABLE CONSUMERS TO BELIEVE THAT THE PRODUCTS ARE HEALTHY AND DO NOT CONTAIN TOXIC INGREDIENTS

18.    Defendant is the manufacturer of various infant and toddler food products, marked to parents of children between the ages of five months to three years. The Amara brand was founded to "create the best, tastiest, healthiest food on the market to support a lifetime of healthy eating."[10] Consumers recognize the Amara brand as a provider of healthy and nutritious foods for infants and toddlers.

19.    Defendant manufactures infant and toddler food products called Organic Smoothie Melts in a variety of flavors. The labels for each of these products give reasonable consumers the net impression that the Products are healthy and do not contain significant levels of heavy metals.

20.    For example, the labels on the Products state:

- "Organic,"
- "Non-GMO"
- "No Sugar Added!"
- "We believe parents shouldn't have to choose between nutrition and convenience. You – and your child – deserve both"
- "Amara Smoothie Melts are blended with the highest quality veggies and fruits with NO ADDED SUGAR!"
- "free of additives and preservatives"
- "highest quality"
- "You're already the best parent—now you have the snacks to prove it."
- The Products "Just" contain organic fruit and coconut milk.

---

[10] https://amaraorganicfoods.com/pages/our-story

7

1  Heavy metals are not "nutritious," "high quality," and children do not "deserve"

2  them as Defendant claims. The Products do not "just" contain fruits and coconut

3  milk since they also contain lead, cadmium, and arsenic. The net-effect or net-

4  impression of the Products' labeling on consumers is that the Products do not

5  contain any unhealthy ingredients like lead, cadmium, and arsenic.

6      21.    The packaging of the Products is displayed below:



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



27    22.    Defendant also includes other extra label advertising which repeats

28  the labeling message, shows Defendant's intended labeling message, and reveals

9

Defendant's interpretation of the consumer perception of the Products' labels. For example, it includes a phony award, the "Mom Must-Have Awards" 2020 logo in advertising:



23. A handful of consumers have been made aware of the testing results. These consumers are shocked by the results. On social media, a consumer posted the test results, and other consumers comment how they thought the Products and

CLASS ACTION COMPLAINT

Brand were healthy for kids, but it "turns out your giving them Lead and other heavy metals linked to cancer!"

> You think you're feeding your kids clean and healthish food. And turns out your giving them Lead and other heavy metals linked to cancer!

> oh my god these are so terrible!!! At this point these things need to be labeled under the ingredients

> oh no! And in here thinking this is a better brand 😞

### HEAVY METAL TESTING OF THE PRODUCTS

24.    The results of the heavy metal testing of the Products are shown below:

CLASS ACTION COMPLAINT

1

## **Mighty Sweet Greens Test Results**

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

🧪 **6FFQ6Y**

**simplelab**

**CLIENT INFORMATION**

**Client:** Tamara Rubin
**Requested On:** Jul 30, 2024
**Phone:** (415) 609-3182
**Email:** tamararubin@mac.com

hello@gosimplelab.com

11455 Pearl St
Northglenn, Colorado 80233



**TESTING PERFORMED**

**Testing Requested:** Heavy Metals Food Test - 4A
**Matrix:** Food
**Testing / Report ID:** 6FFQ6Y

**SAMPLE INFORMATION**

**Collection Date:** Aug 1, 2024
**Collected By:** Leonard Rubin
**Received Date:** Aug 5, 2024
**Reported On:** Aug 9, 2024
**Sample Location:** Lead Safe Mama, LLC Main Office - HQ
**Sample Address:** 7933 Southeast 15th Avenue, Portland, OR 97202, United States

Amara Organic Smoothie Melts
in Mighty Sweet Greens Flavor

**TESTING NOTES**

There were no problems with analytical events associated with this report unless noted. Quality control data is within laboratory defined or method specified acceptance limits except where noted. If you have any questions regarding these test results, please contact hello@gosimplelab.com

**TEST RESULTS**

| ANALYTE | UNIT | RESULT | MDL | METHOD |
|---|---|---|---|---|
| Arsenic | ug/kg | 28.4 | 6 | USP 232/233 |
| Cadmium | ug/kg | 101 | 3 | USP 232/233 |
| Lead | ug/kg | 35.1 | 1.5 | USP 232/233 |
| Mercury | ug/kg | NOT DETECTED | 1.5 | USP 232/233 |

19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

**Carrot Rasberry Test Results**

**4JWDMV**

**simplelab**

**CLIENT INFORMATION**

Kitting, Logistics, and Support provided by: SimpleLab, Inc.

**Client:** Tamara Rubin
**Requested On:** Sep 3, 2024
**Phone:** (415) 609-3182
**Email:** tamararubin@mac.com

Questions? For fastest assistance:
hello@gosimplelab.com
Do not contact facility technicians directly.

**TESTING PERFORMED**

**Testing Requested:** Heavy Metals Food Test - 4A
**Matrix:** Food
**Testing / Report ID:** 4JWDMV
**Testing Facility:** Certified Laboratories
**Facility Location:** 258 West Turbo Drive
                     San Antonio, Texas 78216

**SAMPLE INFORMATION**

**Collection Date:** Sep 6, 2024
**Collected By:** Leonard Rubin
**Received Date:** Sep 10, 2024
**Reported On:** Sep 12, 2024
**Sample Location:** Lead Safe Mama, LLC Main Office - HQ
**Sample Address:** 7933 Southeast 15th Avenue, Portland,
                   OR 97202, United States
**Sample Description:** Amara Organic Smoothie Melts in
                      Carrot Raspberry Flavor (Plant-
                      Based Yogurt Snack)

**TESTING NOTES**

There were no problems with analytical events associated with this report unless noted. Quality control data is within laboratory defined or method specified acceptance limits except where noted. If you have any questions regarding these test results, please contact hello@gosimplelab.com

**TEST RESULTS**

| ANALYTE | UNIT | RESULT | MDL | METHOD |
|---------|------|--------|-----|--------|
| Arsenic | ug/kg | 11 | 10 | 10 |
| Cadmium | ug/kg | 31 | 10 | 10 |
| Lead | ug/kg | 20 | 10 | 10 |

25.    Simplelab is a certified laboratory which contains a network of the world's leading laboratories like Eurofins and EMSL Analytical, Inc.[11] The heavy metal testing performed is validated by these laboratories and scientific authorities.

---

[11] https://gosimplelab.com/

CLASS ACTION COMPLAINT

**EXPOSURE TO HEAVY METALS ARE HARMFUL TO HUMAN HEALTH**

26.    The World Health Organization says that "exposure to lead can affect multiple body systems and is particularly harmful to young children" and that "there is no level of exposure to lead that is known to be without harmful effects."[12]

27.    Even very low levels of lead consumption can lead to learning and behavior problems, as well as symptoms such as loss of appetite, feeling tired or irritable, poor growth, nausea and vomiting, constipation, stomach pain, joint pain and muscle weakness, and headaches.[13]

28.    "Lead alters very basic nervous system functions, like calcium-modulated signaling, at very low concentrations in vitro. The age of 2 years, when lead levels often peak, is the same age at which a major reduction in dendrite connections occurs, among other events crucial to development. It's possible that lead exposure at that time interferes with a critical development process in the [Central Nervous System], but what that specific process is has not been clearly identified. Imaging studies of adults who had elevated blood lead levels in childhood have demonstrated region-specific reductions in the brain's volume and alterations of its microstructure, as well as a significant impact on brain reorganization."[14]

---

[12] *Lead Poisoning*, WORLD HEALTH ORGANIZATION, *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=Lead%20in%20the%20body%20is,measurement%20of%20lead%20in%20blood.

[13] *Lead Poisoning*, *available at* https://kidshealth.org/en/parents/lead-poisoning.html#:~:text=Many%20children%20with%20lead%20poisoning,loss%20of%20appetite.

[14] https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=Lead%20alters%20very%20basic%20nervous,other%20events%20crucial%20to%20development.

29.     The Environmental Protection Agency ("EPA") classifies cadmium as a "probable human carcinogen."[15]

30.     Because cadmium is a cancer-causing agent, California has placed cadmium on the Proposition 65 list. According to the Proposition 65 website, "[e]xposure to cadmium and cadmium compounds can cause cancer of the lung and may cause cancer of the prostate and kidney."[16] "Cadmium is also on the Proposition 65 list because it can cause birth defects or other reproductive harm. Exposure to cadmium may harm a man's reproductive system. Exposure during pregnancy may affect a child's development."[17]

31.     For arsenic, the U.S. Environmental Protection Agency ("EPA") states that "Levels above 10 ppb will increase the risk of long-term or chronic health problems. The higher the level and length of exposure, the greater the risk. … Children are at greater risk ..."[18]

32.     The EPA states that the Maxim Contaminant Level for arsenic is 10 ppb on the basis that arsenic at that level exposes humans to a real risk of developing bladder and lung cancer.[19] "Arsenic ingestion can result in both chronic (long-term) and acute (short-term) health effects." Acute effects include nausea, vomiting, neurological effects such as numbness or burning sensations in the hands

---

[15] *Cadmium Compounds (A) Hazard Summary,* ENVIRONMENTAL PROTECTION AGENCY, *available at* https://www.epa.gov/sites/default/files/2016-09/documents/cadmium-compounds.pdf (last visited July 31, 2023).

[16] *Cadmium and Cadmium Compounds,* PROPOSITION 65- YOUR RIGHT TO KNOW!, *available at* https://www.p65warnings.ca.gov/fact-sheets/cadmium-and-cadmium-compounds (last visited July 31, 2023).

[17] *Id.*

[18] https://www.mass.gov/info-details/arsenic-in-private-well-water-faqs#:~:text=The%20current%20drinking%20water%20standard,and%20risk%20for%20the%20fetus.

[19] https://www.mass.gov/info-details/arsenic-in-private-well-water-faqs#:~:text=The%20current%20drinking%20water%20standard,and%20risk%20for%20the%20fetus.

and feet, cardiovascular effects, and decreased production of red and white blood cells, which may result in fatigue.[20] Chronic effects include changes in skin coloration, skin thickening, and small corn-like growths, especially on hands and feet.[21] "Chronic exposure to arsenic is also associated with an increased risk of skin, bladder, and lung cancer. There is also evidence that long-term exposure to arsenic can increase risks for kidney and prostate cancer."[22]

33.    Arsenic in children is a carcinogen and early-life exposures, including prenatal exposures, are especially dangerous.[23]

34.    Exposure to arsenic can lead to lower IQ, impaired brain development, growth problems, breathing problems, an unhealthy immune system, and cancer as an adult.[24]

35.    The California Office of Environmental Health Hazard Assessment ("OEHHA") has released a comprehensive technical support document on cadmium.[25] This technical document cites to several animal and human studies finding the consumption of cadmium leads to developmental and reproductive toxicity.

36.    The OEHHA technical document on cadmium also cites to several published scientific studies showing that consumption of cadmium may cause

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Arsenic Exposure, available at https://www.aap.org/en/patient-care/environmental-health/promoting-healthy-environments-for-children/arsenic/ (last accessed May 30, 2024).

[24] *Arsenic and Children*, *available at* https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/

[25] *Public Health Goal for CADMIUM in Drinking Water,* OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, *available at* https://oehha.ca.gov/media/downloads/water/chemicals/122206cadmiumphg.pdf

CLASS ACTION COMPLAINT

immunotoxicity, neurotoxicity, renal toxicity, and carcinogenicity.[26] The technical document goes on to say that "[a]dverse effects associated with human exposures to cadmium are well known and have been characterized in both occupational and residential settings."[27]

37.    Research has also linked cadmium exposure with kidney dysfunction and decreases in bone mineral density.[28] Indeed, cadmium "is a toxic heavy metal" that is a "severe health threat" to humans.[29] Cadmium "largely accumulates in kidneys, liver, bone and other organs and causes irreversible damage to the target organs."[30]

38.    The Baby Food Safety Act of 2021 sets levels of exposure for infant and toddler foods at 10 ppb for arsenic, 5 ppb for Cadmium, and 5 ppb for lead because heavy metals above those levels poses a safety hazard. *See* Baby Food Safety Act of 2021, H.R. 2229, 117th Cong. § 4 (March 26, 2021). The Products contain levels of lead, arsenic, and cadmium above those levels.

39.    The FDA has issued guidance that "action levels" for lead are at 10 ppb for "fruits," "mixtures," "yogurts," or "custards/puddings" that are labeled for young children.[31] In making the recommendation, the FDA noted that fresh vegetables are a source of several nutrients and important in the growth and

---

[26] *Id.*

[27] *Id.*

[28] Soisungwan Satarug, et al., *Adverse Health Effects of Chronic Exposure to Low-Level Cadmium in Foodstuffs and Cigarette Smoke,* ENVIRONMENTAL MEDICINE VOL. 112, NO. 10, *available at* https://ehp.niehs.nih.gov/doi/full/10.1289/ehp.6751

[29] Mei Wang, et al., *A review on Cadmium Exposure in the Population and Intervention Strategies Against Cadmium Toxicity,* BULLETIN OF ENVIRONMENTAL CONTAMINATION AND TOXICOLOGY (Jan. 23, 2021), *available at* https://link.springer.com/article/10.1007/s00128-020-03088-1

[30] *Id.*

[31] https://www.federalregister.gov/documents/2023/01/25/2023-01384/action-levels-for-lead-in-food-intended-for-babies-and-young-children-draft-guidance-for-industry#:

development of young children.[32] Here, the Products provide virtually no vitamins or other nutrients. The Products are not healthy as Defendant promises.

### PLAINTIFF'S PURCHASES OF THE PRODUCTS

40.    Plaintiff purchased multiple flavors of the Products in California during the class period. On April 3, 2023, Plaintiff purchased a 6-pack of Amara Smoothie Melts in the Beets n' Berries flavor for $32.99 and a 6-pack of the Amara Smoothie Melts in the Mango Carrot flavor for $32.99 from amazon.com. Plaintiff has also purchased the Mixed Red Berries and Carrot Raspberry flavored Products during the class period in California.

41.    When purchasing the Products, Plaintiff was not aware of the heavy metals in the Product. After reading the label, Plaintiff purchased the Product on the assumption that the labeling was accurate, and that the Products did not contain harmful substances like lead, cadmium, or arsenic and that the Products were healthy.

42.    Plaintiff would not have purchased the Product had she known the Product contains lead, cadmium, and arsenic, substances which are known to be hazardous to human health at the levels present in the Products. Plaintiff would not have purchased the Product had she known they are not healthy for young children. As a result, Plaintiff suffered injury in fact when she spent money to purchase the Products she would not have purchased absent Defendant's deceptive practices.

43.    Plaintiff continues to see the Products for sale at online and at retail stores in California and desires to purchase the Products again if the Products did not contain lead, cadmium, and arsenic or were labeled in a non-deceptive manner. differently. However, as a result of Defendant's ongoing misrepresentations and

---

[32] https://www.cov.com/en/news-and-insights/insights/2023/01/fda-issues-action-levels-for-lead-in-food-intended-for-babies-and-young-children#layout=card&numberOfResults=12

material omissions, Plaintiff is unable to rely on the Products' labeling when deciding in the future whether to purchase the Products.

## REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS

44. Consumers, like Plaintiff, relied on Defendant's labeling statements set forth above, including the statements: "Organic"; "Non-GMO"; "No added sugar!"; "highest quality"; "You're already the best parent—now you have the snacks to prove it."; "We believe parents shouldn't have to choose between nutrition and convenience. You—and your child—deserve both."; and the Products "just" contain fruits/vegetables, and coconut milk. The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain harmful ingredients like lead, cadmium, and arsenic.

45. Consumers, like Plaintiff, want to know if a product they eat contains substances which are hazardous to their health. Consumers, like Plaintiff, want to know if a product they eat contains substances which are declared to be unsafe by governmental organizations. Defendant's nondisclosure of the lead, cadmium, and arsenic in the Products is material because reasonable consumers would deem the presence of these substances in the Products to be important in determining whether to purchase the Products. Defendant has exclusive knowledge that the Products contain lead, cadmium, and arsenic.

46. The fact that Defendant's Products contain lead, cadmium, and arsenic are not reasonably accessible to Plaintiff and consumers. Consumers, like Plaintiff, trust that the food products they purchase do not contain toxic heavy metals like lead, cadmium, and arsenic which have been intentionally or negligently added to the products. Defendant has a duty to disclose the presence of lead, cadmium, and arsenic in the Products because the fact is known to Defendant (that the Products contain lead, cadmium, and arsenic), and the failure to disclose the lead, cadmium, and arsenic in the Products is misleading. The lead,

CLASS ACTION COMPLAINT

cadmium, and arsenic in the Products implicates a health concern that is important to reasonable consumers when deciding to purchase Defendant's Products. Defendant has actively concealed the lead, cadmium, and arsenic in the Products from Plaintiff and putative class members. In fact, Defendant intends and does represent that the Products are nutritious and healthy for infants and toddlers.

47.    A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the product. Here, the Products' central function is for young children to safely consume the Products as a nutritious and healthy snack. Food for "Kids" that contains harmful lead, cadmium, and arsenic does not serve this central function. Reasonable consumers, like Plaintiff, would deem it important in determining whether to purchase the Products because Plaintiff would not have purchased the Products had they known that harmful chemicals like lead, cadmium, and arsenic were in the Products. That is, the omission of the lead, cadmium, and arsenic content of the Products was material because a reasonable consumer would deem it important in determining how to act in the transaction at issue.

48.    A failure to disclose a fact constitutes actionable conduct if the omission causes an unreasonable safety hazard. Here, it is not reasonable to sell a Product that young children eat with lead, cadmium, and arsenic. As explained above, foods with lead, cadmium, and arsenic are a safety hazard because they cause several negative health effects in children including developmental and reproductive problems and an increased risk of certain cancers.

49.    Defendant also made partial representations that the Products are safe and healthy which create the net-impression that the Products did not contain potentially harmful ingredients like lead, cadmium, and arsenic. These partial disclosures are misleading because the lead, cadmium, and arsenic content of the Products was not disclosed.

**PLAINTIFF AND THE PUTATIVE CLASS MEMBERS SUFFERED ECONOMIC INJURY**

50.     Plaintiff and putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. With all the other infant and toddler food products on the market without lead, cadmium, and arsenic, a reasonable consumer would choose to purchase a product without lead, cadmium, and arsenic, and not Defendant's Products. Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Products that were defective, not merchantable, and not fit for their represented purpose. Consumers, including Plaintiff, would not have purchased Defendant's Products if they had known the Products contain lead, cadmium, and arsenic, a substance which has known adverse health effects on humans and especially kids. Defendant did not disclose that the Products contain lead, cadmium, and arsenic.

51.     There are safer alternatives that Plaintiff and class members would have purchased but were denied the benefit-of-the bargain as a result of Defendant's concealment of the lead, cadmium, and arsenic Product. Because lead, cadmium, and arsenic, are a hazard to human health, Defendant has a continuing duty to disclose the presence lead, cadmium, and arsenic in the Products to consumers. Defendant has failed to adequately disclose that the Products contain lead, cadmium, and arsenic. Defendant's Products contain a hidden defect and Plaintiff and putative class members suffered economic injury. Had Plaintiff and putative class members known about the lead, cadmium, and arsenic, they would not have purchased the Products or would have paid less for the Products.

52.     Accordingly, Plaintiff brings this action individually and on behalf of other similarly situated consumers to halt the dissemination of Defendant's deceptive advertising message, correct the deceptive perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products. As a consequence of Defendant's deceptive labeling and material

omissions, Plaintiff alleges Defendant has violated and is violating California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. (the "UCL") and constitutes a breach of implied warranties.

### NO ADEQUATE REMEDY AT LAW

53.    Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

54.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the Product labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). This is especially important here because Plaintiff alleges Defendant has committed "unlawful" acts and brings a claim for violation of the UCL's "unlawful prong." Specifically, Defendant has violated regulatory recommendations which is not "fair" under the UCL. No other causes of actions allow this claim to proceed, and thus, there is no adequate remedy at law for this specific violation of the UCL's unfair prong. Plaintiff's UCL unfair and unlawful prongs claim does not rest on the same conduct as his other causes of action, and there is no adequate remedy at law for this specific unlawful claim. Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of

plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

55.     Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to omit material facts about the Products. Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Injunctive relief, in the form of affirmative disclosures or halting the sale of the Products is necessary to dispel the public misperception about the Products that has resulted from Defendant's unfair and unlawful marketing efforts. In addition, Plaintiff is currently unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiff's investigation have not yet completed, rendering injunctive relief necessary. Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Class:

> All persons who purchased the Products for personal use in the United States within the applicable statute of limitations until the date class notice is disseminated.

57.     Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; and (iv) those that received a full refund of the Products' purchase price.

58.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

59.    The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

61.    <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.    Whether Defendant made material omissions concerning the Products that were likely to deceive the public;

d.    Whether Plaintiff and the Class are entitled to injunctive relief;

e.    Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

62.    <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading

conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

63.    Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

64.    The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.    When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class Members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

65.     Additionally, or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

66.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and Class members.

67.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code §§ 1750 *et seq.***

68.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

69.    Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

70.    At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

71.    At all relevant times, Defendant constituted a "person," as defined in California Civil Code section 1761(c).

72.    At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

73.    The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

74.    Defendant disseminated, or caused to be disseminated, through their advertising, false and misleading representations, including the Products' labeling that they do not contain hazardous substances such as lead, cadmium, and arsenic. Defendant fails to disclose that the Products contain lead, cadmium, and arsenic. This is a material omission as reasonable consumer would find the fact that the Products contain lead, cadmium, and arsenic to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a)    Defendant represented that the Product have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)      Defendant represented that the Product are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c)      Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d)      Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

75.    Defendant violated the CLRA because the Products contain lead, cadmium, and arsenic. Defendant knew or should have known that consumers would want to know that the Products contain lead, cadmium, and arsenic. Defendant had a duty to disclose that the Products contain lead, cadmium, and arsenic. Based on the statutory text, legislative history (which includes the National Consumer Act), the judicial decisions and statutes that existed when the CLRA was enacted, the subsequent case law, and the many amendments to the CLRA from 1975 through 2016, failures to disclose material facts are actionable under the CLRA. In particular, subdivision (a)(5), (7), and (9) of Civil Code section 1770 proscribe material omissions. Defendant's labeling of the Products also created the net-impression that the Products do not contain hazardous substances such as lead, cadmium, and arsenic. Defendant had exclusive knowledge of the material fact that the Products contain lead, cadmium, and arsenic, and Defendant failed to disclose this fact. Defendant actively concealed this material fact. The fact that the Products contain lead, cadmium, and arsenic is material to consumers because reasonable consumers would deem the existence of lead, cadmium, and arsenic in a product they eat important in determining whether to buy the Products.

76.    Defendant's actions as described herein were done with conscious disregard of Plaintiff and the Class members' rights and were wanton and malicious.

77.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

78.    Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

79.    Pursuant to California Civil Code section 1782, Plaintiff will notify Defendant in writing by certified mail of the alleged violations of the CLRA and demand that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA, Plaintiff will amend this complaint to seek actual, punitive, and statutory damages, as appropriate.

80.    Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this action commenced in a proper forum.

## SECOND CLAIM FOR RELIEF

### Violation of California's Unfair Competition Law ("UCL")

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

81.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

82.    Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

83.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

84.    Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising

29

within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and violating California Civil Code sections 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16), California Business & Professions Code section 17500 *et seq.*, and California common law breach of implied warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

85. Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain lead, cadmium, and arsenic) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. For example, several of Defendant's competitors sell baby food products that do not contain lead, cadmium, and arsenic.

86. Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Products. Plaintiff and the other Class

members have suffered injury in fact and lost money as a result of purchasing the Product and Defendant's unlawful, unfair, and fraudulent practices.

87.    Defendant's wrongful business practices and violations of the UCL are ongoing.

88.    Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

89.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seek (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California advertising laws; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

### THIRD CLAIM FOR RELIEF

### Breach of Implied Warranties

90.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

91.    Plaintiff brings this claim individually and on behalf of the Class against Defendant.

### *Implied Warranty of Fitness For A Particular Purpose*

92.    "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of

this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985).

93.    Defendant was at all relevant times the manufacturer, distributor, and/or warrantor of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

94.    Defendant, through the acts and omissions set forth herein, in the sale, marketing, and promotion of the Products made implied representations to Plaintiff and the Class that the Products were fit for the particular purpose of use: that young children can safely consume the Products and that the Products are healthy for young children. However, the Products are hazardous to consume and are not healthy.

### *Implied Warranty of Merchantability*

95.    At the time the Products were sold, Defendant knew or should have known that Plaintiff and members of the Class would rely on Defendant's skill and judgment regarding the safety and composition of the Products. Because the Products contain lead and other heavy metals, they are not of the same quality as those generally accepted in the trade and were not fit for the ordinary purposes for which the Products are used (i.e., to be eaten by young children).

96.    The implied warranty of merchantability "provides for a minimum level of quality" in a good. *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 n. 2 (1995).

97.    To state a claim for breach of the implied warranty of merchantability, a plaintiff must allege a "fundamental defect that renders the product unfit for its ordinary purpose." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 878 (N.D. Cal. 2015); *see also Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) ("The core test of

merchantability is fitness for the ordinary purpose for which such goods are used.”). “Such fitness is shown if the product is in safe condition and substantially free of defects[.]” *Mexia*, 174 Cal. App. 4th at 1303.

98.    “In cases involving human food, a party can plead that a product violates the implied warranty of merchantability through allegations that the product was unsafe for consumption, contaminated, or contained foreign objects.” *Barnes v. Nat. Organics, Inc.*, 2022 WL 4283779, at *8 (C.D. Cal. Sept. 13, 2022) (citing *Thomas v. Costco Wholesale Corp.*, 2014 WL 5872808, *3 (N.D. Cal. Nov. 12, 2014).

99.    Here, the Products are consumed. The Products contain a dangerous substance which compromises the safety and fitness for consuming the Products. *See Barnes*, 2022 WL 4283779, at *8 (finding breach of implied warranty sufficiently pleaded where plaintiffs alleged that the product promoted a healthy pregnancy but was actually contaminated with heavy metals and was thus not favorable for pregnancy); *Rodriguez v. Mondelez Glob. LLC*, 703 F.Supp.3d 1191, 1212-13 (S.D. Cal. 2023) (same where plaintiffs alleged that the products were unsafe for consumption because they contained levels of lead or cadmium).

100.   By advertising and selling the Products at issue, Defendant, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products’ packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendant.

101.   Defendant’s labeling and advertising, combined with the implied warranty of merchantability, constitute a warranty that the Products do not contain hazardous substances such as lead.

102.   In reliance on Defendant’s skill and judgment and the implied

warranties of fitness for this purpose and merchantability, Plaintiff and members of the Class purchased the Products to be consumed by young children. Defendant knew that the Products would be purchased and used without further testing by Plaintiff and Class members.

103.   Consumers are the intended beneficiaries of the implied warranty as they are the ones Defendant made the Products for and specifically marketed the Products to consumers. Defendant breached the implied warranty of merchantability. Because the Products contain lead, they are not fit for ordinary use (i.e., consumption by young children).

104.   As a direct and proximate result of Defendant's breach of warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products.

105.   Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for the loss of that money, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result. Injunctive relief is the primary goal of this litigation.

106.   Plaintiff seeks punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiff and the Class. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of

34

Plaintiff and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's misconduct is oppressive. Reasonable consumers would look down upon it and/or otherwise would despise such misconduct. This misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

## REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b. Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c. Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d. Ordering damages for Plaintiff and the Class;

e. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

1       g.    Ordering such other and further relief as may be just and proper.

2       **JURY DEMAND**

3       Plaintiff demands a trial by jury of all claims in this Complaint so triable.

4

5       Dated: October 18, 2024       CROSNER LEGAL, P.C.

6       By:    */s/ Craig W. Straub*

7       CRAIG W. STRAUB

8       Craig W. Straub (SBN 249032)
craig@crosnerlegal.com

9       Zachary M. Crosner (SBN 272295)
zach@crosnerlegal.com

10       9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210

11       Tel: (866) 276-7637
Fax: (310) 510-6429

12       *Attorneys for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

<u>Civil Code Section 1780(d) Affidavit</u>

I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendant has done, and are doing, business in California, including in this district. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 18, 2024 at San Diego, California.

By:       */s/ Craig W. Straub*

CLASS ACTION COMPLAINT